THORNDIKE *v.* BARRETT.

Where the proprietors of a large tract of land had conveyed a parcel to *R. T.*
by metes and bounds, and also contracted to sell him an adjoining parcel,
which, under that contract, he had entered upon and enclosed within fences,
—and afterwards they conveyed to *W. M.* " *all their unappropriated lands*"
in the same tract, bounding it in part " *on land of R. T.*" whose deed was
not then on record ;—it was holden that the lands thus possessed by *R. T.*
were " *appropriated,*" and did not pass to *W. M.*

The lands of a person deceased, of which he was disseised actually and not
colourably at the time of his death, are not liable for the payment of his
debts.

THIS was a writ of entry in which the demandant counted on
his own seisin within thirty years, and a disseisin by the ten-
ant ; and it was tried upon the general issue, at the last *October*
term in this county.

The demandant, to prove the issue on his part, read in evi-
dence a deed to himself from *Mary Molineaux,* administratrix on
the estate of *William Molineaux,* dated *September* 11, 1818, and a

Thorndike v. Barrett.

licence from the Common Pleas to her for that purpose. He also proved that after the date of his deed and before the commencement of this action, he entered peaceably into the land, the tenant opposing and forbidding him for the sole purpose of trying his title.

The tenant then read in evidence a deed of the premises from one *Joseph Pierce* to him, dated *April* 1, 1817 ; and proved that at the date of the demandant's deed, the tenant was in fact in possession of the land, having it enclosed in fence and under cultivation. He also read a deed from the *Twenty Associates*, dated *February* 15, 1806, conveying the premises to *Pierce*, his grantor.

The demandant then offered in evidence a deed dated *September* 14, 1790, from one *John Molyneaux* in his capacity of clerk to the *Twenty Associates*, and by virtue of divers votes of the proprietary *therein recited*, conveying to said *William* a large tract of land called *Beauchamp Neck* containing *five* hundred acres, of which the premises were a part ; it being the same deed mentioned in *Barrett v. Thorndike*, 1 *Greenl.* 73. and on which the standing committee of the proprietors had certified their approbation. This deed recited a vote of the proprietors *September* 23, 1785, directing the sale of *Beauchamp Neck* by the standing committee ;—a vote of the standing committee *October* 31, 1785, mentioning that several offers had been made for *Beauchamp Neck* " supposed to contain about *five* hundred acres," and accepting the offer of *W. Molyneaux* it being the highest, and thereupon voting to sell him " *all the unappropriated lands on* " *Beauchamp Neck*, he paying six shillings per acre ;"—another vote of the proprietors *December* 12, 1789, in which the two preceding votes were recognized, and the clerk directed to make out to *Molyneaux* " a good and lawful deed agreeably to the " usual forms in like cases practised," he having " complied with " the conditions as per account settled the fourth instant ;"— also a prior vote of the proprietors passed *May* 13, 1768, empowering the clerk to execute any deeds which the standing committee shall judge necessary for conveying any lands of the proprietors, to be approved by an indorsement by at least two of the committee in writing, on the deed ;—and then proceeded to convey the lands, describing them as bounded " northwest

" on land of *Abraham Ogier*, and land of *Robert Thorndike* con-" *taining fifty acres*, and a pond." To this the tenant objected, that it purported to be, not the deed of the proprietors, but of *John Molyneaux*, who did not appear to have any interest in the land ;—and if not, yet the recitals in the deed were not the proper evidence of his authority to convey. He also offered to prove that in one of the recitals in the deed there had been a fraudulent alteration of the word *four* hundred to *five* hundred acres, by which the authority of the deed, as evidence of the vote, was wholly destroyed. But the presiding Judge overruled this objection, and admitted the deed.

The demandant also read a deed from the *Twenty Associates* to *Robert Thorndike* of fifty acres of land, dated *November* 9, 1768, and recorded *January* 21, 1794.

The tenant then offered to prove that the alteration of the word *four* to *five* was made by *William Molyneaux* himself, and that he had also fraudulently interlined the words " *containing* " *50 acres*" in the description of the land, and to shew the materiality of the alterations, he further offered to prove that at the date of the deed to *Molyneaux* and long before, *Robert Thorndike* was in possession of the demanded premises, adjoining his fifty acres, having the land inclosed in fences and under actual improvement, under a contract with the *Twenty Associates* for the purchase of it ; that no line had then been run between the demanded premises and the fifty acres ; and that the land in dispute, as well as the fifty acres, was commonly called in that neighbourhood *Robert Thorndike's* land, and that this was well known to all parties. He also offered to prove that *William Molyneaux* was never in the actual possession of the premises, but that *Thorndike* continued to occupy the same till the deed to *Pierce*, and that *Pierce* entered and occupied till he conveyed to the tenant. He also offered to read a copy of the judgment in trespass in the case, of *Barrett v. Thorndike* rendered for the present tenant upon a final trial ;—also an account settled by *William Molyneaux* with the *Twenty Associates* in which he credited them with the price of the *Beauchamp* Neck, as containing *four* hundred acres.

All this evidence was rejected by the presiding Judge.

Thorndike v. Barrett.

It also appeared that *Robert Thorndike* always denied and resisted the claim of *William Molyneaux* to the demanded premises, but never pretended to hold in opposition to the right of the *Twenty Associates* ; from whom in 1804 he took a lease of the premises for the term of one year.

The tenant then contended that, inasmuch as he was in the open and visible possession and occupation of the premises at the time of the execution of the deed from the administratrix to the demandant, nothing passed by this deed ;—but the Judge overruled this objection, and instructed the jury that by the original conveyance from the *Twenty Associates* to *William Molyneaux* the demanded premises passed to the grantee, and that the demandant had maintained his action ; and they found for the demandant. The verdict was taken subject to the opinion of the whole Court upon the correctness of the opinions of the presiding Judge, in admitting or rejecting the evidence aforesaid, as stated in his report of the trial.

*Orr, Fessenden,* and *Wheeler,* for the defendant.

1. Nothing passed by the deed from the administratrix to the demandant, because her husband was never actually seised of the land. *Thorndike* having held adversely from the year 1790, the right of entry in *Molyneaux* was gone. He *always* resisted the latter's right to the land. *Atkyns v. Horde,* 1 *Burr.* 107. *Co. Lit.* 29. *a.* 153. *a.* 1 *Taunt.* 588. 3 *Bl. Com.* 176. *Prop'rs of No.* 6 *v. M'Farland,* 12 *Mass.* 325. Or if the intestate was *ever* seised, yet he died *disseised,* and so the land was not liable for the payment of his debts. *Nason v. Willard,* 5 *Mass.* 240. *Poor v. Robinson,* 10 *Mass.* 131. *Boylston v. Carver,* 4 *Mass.* 607.

2. The deed from *John Molyneaux* conveyed nothing, it not being in terms the deed of the proprietors. If he had authority to convey, it was never properly executed. *Stinchfield v. Little,* 1 *Greenl.* 231. *Elwell v. Shaw,* 16 *Mass.* 42. But he had no authority, the recital of the votes in the deed being not the proper evidence of the fact. 1 *Phil. Evid.* 319—321.

3. If, however, these recitals might be sufficient under other circumstances, yet the deed being materially altered, all its credit is destroyed. And the tenant ought to have been ad-

mitted to prove these alterations.   The existence of a deed to *Thorndike* was not conclusive evidence of the extent of the land called his, since he claimed and held within fences the adjoining land under a contract, the land being thereby " appropriated," and so not within the deed to *Molyneaux.*   And so *Moly-neaux* understood it, or he would not afterwards have altered his own deed.   These parts were proveable by parol.   *Storer v. Freeman*, 6 *Mass.* 435.   *King v. King*, 7 *Mass.* 496.   *Albee v. Ward*, 8 *Mass.* 83.   *Townsend v. Weld*, 8 *Mass.* 146.   *Leland v. Stone*, 10 *Mass.* 459.   *Adams v. Frothingham*, 3 *Mass.* 352.

4. The deed to *Molyneaux* was obtained by fraud, and is therefore void.   It appears from his account settled with the proprietors at *Boston* that he was their agent for the survey and care of these remote lands; and that he falsely represented the Neck to contain but 400 acres, when in truth it contained at least *five* hundred.   A deed thus obtained by imposition and fraud ought not to be received as evidence of title ;—and the grantors might well convey the lands to another.   *Smithwick v. Jordan*, 15 *Mass.* 113.

*Longfellow, Greenleaf*, and *Thayer*, for the demandant.

1. The recitals in the deed are good evidence, *prima facie*, of the votes of the proprietors, especially after this lapse of time. If not, they may be considered as certified by the clerk, his signature being upon the deed.   And the original vote directing the clerk *to convey* is a prospective ratification and adoption of such deed as he might make and the standing committee approve.   If the authority was defectively executed, it is cured by *Stat.* 1823. *ch.* 228.

2. By the land of *Thorndike*, mentioned in the deed, must be understood the land he *owned*, which could only be known by reference to his title-deed.   The parol evidence offered would have contradicted this, and was therefore inadmissible ; or, if not, it was not the *best* evidence of the fact.   *Storer v. Free-man*, 6 *Mass.* 440.   *Crosby v. Parker*, 4 *Mass.* 110.

3. Of the estate thus conveyed *William Molyneaux* was seised.   The lease from the proprietors to *Thorndike* in 1804 was an admission of *their* seisin, which instantly enured to the benefit of their grantee ; whose seisin both the parties to the lease

Thorndike *v.* Barrett.

are thereby estopped to deny. If not, yet the demandant entered under his own deed, which he might well do, the right of the intestate being conveyed thereby. *Drinkwater v. Drinkwater,* 4 *Mass.* 354.

4. The alterations have been decided to be immaterial, and not to affect the title to the estate. *Barrett v. Thorndike,* 1 *Greenl.* 73. And it does not appear but that the quantity was truly represented at *four* hundred acres.

Weston J. delivered the judgment of the Court as follows.

Whatever may be the true construction and effect of the deed of the fourteenth of *September* 1790, purporting to convey to *William Molyneaux,* the title of the *Twenty Associates* to the lands therein described, it does not appear that the said *William* in his life time ever had the actual occupation of the premises demanded. Admitting the land in controversy to have been included in, and to have passed by, this deed; yet it appears that this effect was contested by the grantors. *Robert Thorndike* then in possession under them, continued to occupy the premises, denying and resisting the claim of *Molyneaux.* ' In this he was supported, as the tenant offered to prove, by the *Twenty Associates,* who recognized and claimed *Thorndike* as their tenant; and in *February* 1806, actually conveyed the land in question to *Joseph Pierce* in fee, who, by his agent, took possession of the same, which was continued until he sold to the present tenant, who has ever since had the exclusive possession and occupancy of the demanded premises; claiming to hold them as his own. *William Molyneaux* therefore became disseised, if he ever was in fact seised; and this disseisin must be considered as having commenced soon after the date of his deed. The grantor cannot lawfully enter upon and oust his grantee, but such act would notwithstanding be a disseisin, as much as if committed by a stranger.

It is true that in a comparison of title, if the deed to *William Molyneaux* passed the premises, the subsequent adverse possession of *Robert Thorndike,* and of *Joseph Pierce* and his grantee, would be found to have been tortious. Each deducing his right from the same origin, *Molyneaux's,* as the more ancient, must have prevailed. But the disseisin would continue until it was

purged or extinguished by peaceable entry, or by judgment of law. It does not appear that *Molyneaux* availed himself of either of these remedies. He died therefore disseised. He in his life time, while the disseisin continued, could not by law have passed his right to a stranger. Could his personal representative do so, upon his decease? If she *could not*, then however well founded the right of the intestate may have been, the title of the demandant fails.

It is insisted that under a license of Court duly obtained, the administratrix might lawfully sell the right of the intestate; and that it was competent for the demandant, as the purchaser to enter upon the premises and to demand the same in a suit at law, as he has now done, counting upon his own seisin. The case of *Drinkwater v. Drinkwater*, 4 *Mass.* 354. is relied upon as an authority justifying this course. Chief Justice *Parsons*, in delivering the opinion of the Court there says, " if the lands " are liable to the payment of the intestate's debts, he (the ad-" ministrator) may lawfully sell them on license, whether they " are in the possession of the heir, or of his alienee or disseisor. " For no seisin of the heir, or of his alienee, or of his disseisor, " can defeat the naked authority of the administrator to sell on " license." But this reasoning is predicated on the assumption that the intestate died seised. In the case of *Willard v. Nason*, 5 *Mass.* 240. the same learned Judge, commenting as the organ of the Court, upon the statute of *Massachusetts*, under the authority of which the sale was made to the demandant in this action, remarks that " it may be further observed that the " lands of a person deceased are not liable for the payment of " his debts, unless he died seised of them, or had fraudulently " conveyed them, or was colourably and fraudulently disseised " of them, with the intent to defraud his creditors." And this is the language also of the fifth section of the statute of *Massachusetts* 1805. *ch.* 90. and of the revised statutes of this State, *ch.* 72. *sec.* 1.

Thus it clearly appears that the lands of a person deceased; of which he was disseised actually and not colourably, at the time of his death, are not made liable for the payment of his debts. The land in question, if it ever belonged to the intestate, being thus circumstanced, it results that the license ob-

Thorndike *v.* Barrett.

tained by the administratrix of *William Molyneaux* did not extend to this land ; and that the demandant could derive no title under her deed.

By the deed to *William Molyneaux*, it is recited that the stand-ing committee of the *Twenty Associates*, at a meeting holden on the thirty-first of *October* 1785, agreed to accept the offer of the said *William*, and to sell to him all the *unappropriated* lands on *Beauchamp Neck ;* and it is further recited that at another meeting of the same committee, the said *William* having com-plied with the conditions on his part to be performed, the com-mittee, referring to their agreement before mentioned, voted that the clerk of the propriety should make out a good and sufficient deed to the said *William* of the said *Beauchamp Neck,* according to the usual forms.   The tenant offered to prove that at and before the date of that deed, *Robert Thorndike* was in possession of the demanded premises by distinct metes and bounds, fences and actual improvements, under a contract from the *Twenty Associates* for the purchase of the same.   This con-tract, and the actual possession of *Thorndike* under it, must be considered as an appropriation of this land, within the true in-tent and meaning of the agreement recited.   Of this appropri-ation neither the *Twenty Associates* nor *William Molyneaux,* from the nature of *Thorndike's* possession, could be ignorant.   It could not have been understood, by either of the parties, that the vote of the committee extended to the sale of this land which, if made, would deprive the propriety of the power to fulfil their contract with *Thorndike ;* and thus render themselves liable to answer in damages to him for its violation.   To ap-propriate, is to consign or set apart to a particular use or desti-nation.   This was virtually done by the contract with *Thorn-dike,* who had thereupon entered into the actual possession and enjoyment of the land in question ; his title to which was to be-come consummate and indefeasible, upon the performance of certain conditions on his part.

But it is contended that the tract conveyed, being bounded on *Robert Thorndike's* land, this must be construed to mean the fifty acres which he actually owned, and not that which he had only contracted for ; and the case of *Crosby v. Parker,* 4 *Mass.* 110, is cited to support this position.   *Crosby* was there

bounded by *Joseph Wilson's* land. *Wilson* owned one piece and had contracted for, and was in possession of, another adjoining; and the Court held that *Crosby's* title extended to the former. One of the reasons assigned by the Court for their opinion is, that *Wilson's* first purchase was " all the land of which he had " any title on record, by which the tenant could ascertain the " boundaries." In the case before us it appears that *Thorndike's* deed of the fifty acres, was not recorded until some years after the execution of the deed in question. But the most material difference between the two cases is, that the committee of the *Twenty Associates* agreed to sell only the unappropriated land. By construing the " land of *Robert Thorndike*," as expressed in the deed, to mean as well that which he occupied and possessed under contract to purchase, as that which had actually been conveyed to him, the unappropriated land alone passed, in conformity with the manifest intention of the parties. But if, by this boundary, we are to understand the fifty acres, it would embrace land which the grantors had before appropriated, by their contract with *Thorndike.* By the former construction every part of the deed is consistent; and embraces all which the parties could have contemplated.

That the grantee thus understood it, if any further evidence were necessary, the tenant offered to prove that after the execution of the deed, he fraudulently inserted therein after the words " land of *Robert Thorndike*," the words " containing fifty acres;" thereby plainly indicating his consciousness that his title could not extend to *Thorndike's* fifty acres, without these additional words.

We are, for these reasons, of opinion that the evidence rejected, tending to shew what was meant by *Robert Thorndike's* land, ought to have been admitted; and upon this ground as well as from the want of authority in *Mary Molyneaux* to sell this land, for the reasons before stated, the verdict is set aside, and a

*New trial granted.*